May it please the Court, Peter Cronella for Appellate Impact Funding. As the record reflects, this case arises out of impropriety within the mortgage industry. Appellates allege aiding and abetting fraud, aiding and abetting conversion, negligence, and other things against respondents relating to the sale and purchase and ultimate resale of residential mortgage loans. The District Court dismissed those claims on the 12B6 motion and in doing so made numerous factual determinations and drew inferences including the following, and I'd like to give you these examples. The Court stated the reasonable inference arising from these facts is that defendants were fulfilling their obligations under a valid business contract to purchase loans from General Mortgage. It goes on. These facts show simply that the parties engaged in a typical transaction in the mortgage industry. And last example, the transaction was a standard business affair. These, which are just a few of the factual determinations and inferences drawn by the District Court, show I think two things that are important. One, that in drawing the factual inferences and making factual determinations, the Court did not view the facts alleged in a light most favorable to plaintiffs as the law requires, but rather in a light most favorable to respondents. And I think this was improper. The other thing it shows, I believe, is that the very premise that seems to underlie the entire opinion by the District Court, that is that the actions of the respondents were somehow legitimate because they were standard business affairs within the mortgage industry, is faulty. I think we've seen over the last year or so that the mortgage industry is less than standard, that business practices have been less than legitimate, and that an opinion that is based on an understanding that the mortgage industry is operating on the up and up, and that you can give the benefit of the doubt to defendants because they were operating under standard business in the mortgage industry, is itself flawed. And with that in mind, and understanding this is a de novo review, I want to walk through a little bit. Well, stupidity and fraud are two different things, right? In the mortgage business. You can't have a cause of action just because practices weren't as smart as they should have been. Well, here I think we have allegations that show there was more than just bad business or stupid business on the part of the parties. I think we have, with the element of knowledge, let's go to that, those allegations. It was very important to the Court. The Court ---- Well, we know they had knowledge as to some subset. As to the second loan set, yes. But I think there are allegations sufficient to draw the inference that they had knowledge as to all of the loans in question based on allegations and evidence of the Bailey letters that were sent between ---- But I guess it's the question. The question becomes at what level of specificity do they have to have knowledge to be responsible for aiding and abetting fraud? I mean, they knew the Bailey letters demonstrated that they knew that in some other transactions, impact was essentially the funder. Correct. For GMC. And that the money was due to impact. But that doesn't mean they knew it with regard to the particular. And for all I know, and you know or the complaint knows, GMC may have dealt with several different funders. Right? So they ---- so how would they know that it was impact, for example, that was the problem? Well, I think if you look individually, and I think that's what the district court did, and I think that's what Respondents urged the Court to do, is to look at these allegations sort of individually and pull them apart. No, no, I don't think so, because I think that's the key one. In other words, the three allegations seem to be they knew that impact was the funder in other times. They knew GMC needed a funder. And in general, it's the custom and practice to make sure that they ---- that the original mortgage or is, in fact, solvent, and they did that. And what else? That's about it. Are those the allegations from which the inference was supposed to be drawn? But I think those two are critically correct. One, they understood the business relationship and that the mortgage lender needed a warehouse line, basically. Right. The other is that they ignored their common custom and practice, their own internal policies and procedures. Now, that's made on information and belief, I understand. But how does that lead to the fact that they knew that GMC was defrauding impact? Because I think when you get later on a letter that says, wait a minute, there's a fraud taking place, and we ask you to not send the money directly to General Mortgage, and then they do it, they don't stop, they don't put on the brakes. You're saying that the third ---- I thought of this myself last night. So you're saying the third point is that when they actually did have knowledge, they still did it. Exactly. And that, when you take that, it infers back on the other allegations. And we're talking about the pleading level. We're talking about an inference drawn most favorably to plaintiff. At that point, I think you can say that there is enough here to get by the Rule 9B specificity as to knowledge. All right. So let's assume this. Let's go on to the substantial assistance. Okay. I think this is important. I think this is where the Respondents and district court missed, because they draw a too narrow of a understanding of what the fraud is. The fraud had two parts. There was the front end, which was what the district court focused on, which was the exchange of fraudulent loan documents between Impact and the mortgage lender. But that alone wasn't the fraud, and that alone wouldn't have accomplished the scheme. You needed the sale on the back end of the original notes in order for the mortgage lender to make the fraud scheme work. It's true that the front end, there was no substantial assistance as to the exchange of fraudulent documents. But if they hadn't given the lock and said we'll buy these, they hadn't known that CSFB was going to ignore their policy procedure, send the money directly to the mortgage lender and not to the warehouse lender, and purchase the loans, there wouldn't have been a scheme. There is no scheme without the back end. So there is a substantial assistance. CSFB gave them the lock. CSFB purchased the loans, and they wired the money directly to the bank accounts of the mortgage lender, opposite of standards practiced in the industry, opposite, we allege, on their own internal practices. So there is a substantial assistance. Understanding this requires understanding the transactions a little more than at least I do. The holding, the documents themselves were just evidences of a transaction, they were not the transaction, right?  Loan documents. They were, you know, evidence of. Were they negotiable? I mean, if IMPACT had these documents, could they go out and do anything with them themselves? IMPACT would have been able to sell the, yeah, they were. Just for having the documents? The document, the actual loan documents themselves. It gives them possession of the notes. Exactly what the mortgage lender. Well, they had possessions of the notes, but the note was in the name of GMC, was it not? No, the notes were sold to GMC, then sold back to IMPACT. But what did the documents show? Did the documents show that that sale or were the documents in favor of GMC? I believe the document was in favor of IMPACT. Is that right? That's not how I understood the record. My understanding is that there was a reverse, that the loans were sold to the mortgage. The mortgage owner makes the loan. They sell the documents back to IMPACT. IMPACT then transfers them back to GMAC with the understanding they'd be sold back within 30 days. That is when they, and then when they said they're going to be sold back, they sent the forged loan documents back. That's my understanding. But did the documents on their face show that the mortgagee owes money to GMC or owes money to IMPACT? GMC. GMC, right? Yes. So what was IMPACT going to do with these documents if they just held them? They wouldn't hold them. They would transfer them under the Bailey letters then to the — Well, I understand that, but at the point they got them from GMC, and whether they were forged or not forged, as I understand it, in half the cases they didn't get them from GMC. They never got anything. They got forged documents. Or they got none. I gather that in half the cases they got none. Yes. All right. So could they — so they're now sitting there with — let's assume that the thing had gone properly, not improperly. They would be sitting there with documents that said Joe owes money to GMC, right? Not to IMPACT. They would — yes. So what were they going to do with those documents, just as documents? They weren't going to be able to go out in the market and get money for them. Well, no, they would transfer those — what they would do is they would — I'm just trying to see how the documents as documents relate to the fraud. The documents as documents relate to the fraud in this way. The way it was structured was that the loans were to be transferred to IMPACT. IMPACT would then transfer them to the seller on the secondary market so that they — the loans would — But only with GMC's concurrence, right? In other words, IMPACT by itself could not have gone out with these documents, done anything with them. Is that right? Well, GMAC, under the — under the Warehouse Line Agreement, GMAC arranged the sales themselves. I know, but if they hadn't done it, if GMC didn't do that, IMPACT sitting there with the loan — with these documents was not going to be able to do anything with the documents. Is that — I think you're correct, Your Honor. That wasn't the intention of the deal. But that — you know, that goes back to the very basis of the Warehouse Lending Agreement and what — how it operated and how it was intended to operate, which was that GMAC would sell these on the secondary market, that then that money would flow from the secondary market to IMPACT to repay the Warehouse Line. That's the whole — that's where IMPACT got the reassurance that it would be getting a payment for its loans on the Warehouse Line and any payments that were being made, and then it would get service payments during the time lag between the sales. If I can reserve some time for — Yes, you certainly may. All right. May it please the Court. My name is Jeff Smith. I'm here today on behalf of Credit Suisse and DLJ Mortgage, and I must say it's always nice to be back in one of the most beautiful courthouses in the country. The Supreme Court, less than a year ago, in the Bell Atlantic v. Twomley case, reiterated that a proper complaint needs more than suspicion, more than speculation, more than unwarranted inferences, more than formulaic recitations. Instead, a plaintiff must bring forward a plausible legal theory, and that plausible legal theory must be accompanied by appropriate factual allegations. Well, the theory is plausible here. It's the question of allegations, correct? I don't believe the theory is plausible in the least, Your Honor, and here's why. Supposedly, my clients, who were strangers to this contractual arrangement between IMPACT and General Mortgage, they had no copy of it. They knew nothing of it. They're supposedly conspiring with General Mortgage to make this all happen. Well, the first question I have — Well, in theory, that could happen, I suppose. Well, I guess, Your Honor, but at some point, you know, we need to identify what benefit we would possibly be achieving by doing that, and there's no benefit hinted at in the complaint. There is, in fact, no benefit whatsoever. They could have been paying less for the ultimate mortgages because — Absolutely. — because there's one of the people who would otherwise be making a profit is being cut out. Could be, but they haven't alleged that anywhere. Well, that's why I said it's more that there's an absence of — it seems to me your stronger argument is that while it could happen in theory, that the pleading is — the facts is sufficient. Absolutely. I just — I start with, I guess, the — But they don't have to prove a motive. I mean, if they prove the fact, they don't have to — I mean, the fact is there could be a motive. We've just seen what it could be, but why would they have to put that in the complaint? Well, they would, and I just start with I do think the thing has to have some plausibility and something more than this is just convenient deep pockets that we'd like to go after because the real fraudster, who isn't in the case, of course, you know, is not able to take care of their losses. Therefore, let's find some ancillary claims. But the question is — leave aside the knowledge issue as to the first chunk for the moment. As to the second chunk, we know that they did have knowledge, or at least they had an allegation, and they went ahead anyway. Is that much not true? I don't think that they had a sufficient allegation, and let me tell you why. The fraud — and this starts back with what is the fraud? Yes, I think that's a key question there. The delivery of forged loan documents to MPAC, and MPAC's providing financing money to General Mortgage for those. That's the fraud. But is that true? This is why I was trying to find out before is what these documents by themselves did or didn't do for MPAC, and the answer is not much, just as documents. They were basically — MPAC was holding them as against the possibility of GMAC doing what they actually did, which is to go out and sell these mortgages to somebody else. But the documents as such weren't doing MPAC any good. It was just kind of holding the goods, so to speak. Well, Your Honor, the documents, if you look at them, they're called these repo agreements, and it actually all has to do with the bankruptcy laws and trying to establish that who has ownership in the event that there's a bankruptcy. There's some reasons these things are structured the way they are. But in the end — But is it true that the documents as such were not anything MPAC could go sell on its own behalf? Correct. All right. Correct. The documents ran in favor of General Mortgage. And I should note — So without more — without more, MPAC wasn't going to get anything out of this deal, and GMAC was — had to do more in order to perfect the injury to MPAC than simply not give them forged documents. Well, no, because GMAC was getting money from MPAC for the forged documents. It didn't need to do anything else. You didn't even need to have bona fide loans here. This is alleged to be a Ponzi scheme. You didn't even have to have real closings. They could simply have delivered up forged mortgage documents and received cash for them. It's complete unto itself. There is no back end. But I thought they only received cash when the loan, not the paper, but the actual transaction represented by the paper, was sold to somebody else. Nobody got money until then. No, no, no. They received advance funding to close the mortgage. Essentially what's happening is you've got a mortgage origination company. It's looking at MPAC and various other lenders to get money, which it in turn is then lending to the borrowers, people like you and me. So you're saying that the — they got money as a funding just for the documents. Absolutely. They later had to pay — they later got some profit on the loans when they were sold, which they then divided up with MPAC. Exactly. And there was interest they were earning on the financing as well. It's loaning money. That's all they were doing. And basically the warehouse was supposed to give them assurance, security, that they'd get repaid. The problem was they were handed forged loan documents. There's no allegation in this pleading that my client ever knew that, that my client ever had anything to do with that. And that's important because if you look at the case law, if you look at Casey, if you look at the alliance decision by this court, they're very clear that if you're going to charge someone with aiding and abetting, they have to know about the specific tortious conduct that they supposedly are assisting. And they have to know ahead of time. Agreed. And there's not a bit of evidence in this record that they ever knew anything about any forged documents coming from general mortgage to MPAC. In fact, it's quite interesting that MPAC, well, it's in the business. It knows that if it's got forged mortgage documents, it has no legal interest in the actual bonafide loans whatsoever. Zero. None under California law, none under New York law. A forgery is a forgery. You take nothing. It's very interesting that when we get to July 04, the second loan set, when they discover the problem. Can I ask a question? Mm-hmm. Again, my understanding, at least my tentative understanding, is that the reason that they had an interest in the loan transaction was not because of the documents, whether they were forged or not forged, that the documents were simply something they were holding for evidence of something else, something else being a promise by GMAC to pay to MPAC, pay back to MPAC when they sold the loans to somebody else. I'm not MPAC's lawyer, but if I was, I would probably be telling you that under the repo agreement, MPAC claimed to own the loans. That's how they get around the bankruptcy problem. Yes, they claim to own the loans, but the paper was not the evidence of that. Because the paper wasn't even written that way. The paper said that it was GMAC that owned the loans. But it was assigned to them, sold to them by specific instrument which they took, which was a fraudulent instrument because the loans themselves were fake. I mean, they were phony signatures or whatever. We don't know. It doesn't tell us in the pleading. But what we do know for sure is that there's no evidence that anyone ever told Credit Suisse or DLJ that there was forgery going on here. And I should recall, and it's in the record, some supplemental record. So what is the allegation that they did tell them something? Well, let's start with that, because I think it's obviously their, quote, best evidence. I still don't think it gets them close. And let me explain why. Where is it? Which paragraph? It's paragraph 27. July 26, 04. July 26 is when they claim they first find out about the fraud. Oh, I see. In paragraph 26. Right. You're working your way down from there. They claim they first found out about the fraud. Now, I note they take two days before they do anything. All right. But they know on the 26 that supposedly they've got worthless documents, forgeries, and they know that there's already a commitment by DLJ to buy these eight mortgage loans that they thought they had advanced against and that they thought they owned. So they know that on the 26. They know there's already a contract in place on those eight loans. They take two days to make any contact whatsoever, according to their pleading. Now, their pleading says somebody, we don't know who, calls somebody, we don't know who, although obviously IMPACT has to know who it was that made the call, but they don't share that information with us. But somebody makes a phone call and says that IMPACT has an interest in these loans. That's clear enough, and we don't deny that they make that claim. In point of fact, legally that was not true. They had no interest in those loans because they only had forgeries. But we'll leave aside that what they said was not true. They also claim in their paragraph 27 that they told someone, we don't know who, don't tell us, you know, that there was a secondary mortgage market fraud going on. Now, I would note that that's not the same thing as saying we are getting forged mortgage documents from General Mortgage. They never said that, okay, to us. In some instances they weren't getting forged mortgage documents. In some instances they got none. Absolutely. That's right. And this to me goes back to the fact that the documents were not the core of anything. What was the case was that they had a the fraud appears to have been more generally that GMAC represented to them that they were selling them the loans and intended to pay them, repay them when they sold them to third parties and that they never intended to do that at all and weren't doing it. And that the documents are somewhat beside the point. Well, I don't think in a mortgage transaction documents are ever besides the point, Your Honor, because in fact when they were delivered to DLJ, which bought them, and by the way, bought them pursuant to a longstanding agreement that was in effect two years before this ever happened. It was buying mortgage loans directly from General Mortgage. And that's in the record. Now, they, DLJ, get the mortgages from General Mortgage and they're in perfect form. They're assignable and they buy them just like they've always bought them in accordance with the terms of the contract. Now, the contract says to DLJ, you must pay for these mortgages, whoever it is General Mortgage tells you. General Mortgage says pay us. So we did. And by the way, when they finally get around four days after discovering this to sending us their formal notice of an alleged interest in these loans, they don't tell us to not buy them. They say, oh, yeah, go ahead and buy them. Just pay us. So they were objecting to our purchasing these loans. They said, oh, you can buy them. Just pay us because we're the ones that have the interest. Well, you know what? They didn't have the legal interest. And more importantly, they didn't say to us, we'll indemnify you. We'll indemnify you against your breaching your agreement with General Mortgage by paying us instead of paying the party that you're obligated to pay under your written agreement, which is General Mortgage. So I would say, Your Honor, there's not one word to suggest that there was any disclosure of the nature of the fraud that was occurring here. There's not one bit of evidence that there was any assistance going on here. The bottom line is this impact entered into a bad contract with allegedly bad people at General Mortgage. It didn't police its relationship appropriately. And it now is trying to blame strangers to that contract for problems that it created and that it alone created. I will suggest the mortgage market's got plenty of stresses today, as we know. We read about it every day in the paper. But if you were to accept the theory being urged on you by impact, you would create incredible inefficiency in the market, incredible uncertainty as to who is responsible for what. And I would suggest there's no precedent in any case to support extension of the law in that manner. The closest things you find in this area are cases where the financier knows that the mortgage lender is operating a fraudulent scheme and keeps funding the mortgage lender anyway. That's the Alliance case that this Court decided not too long ago. We're not the financier. Impact was the financier. We're an investor. We paid fair value for loans. We have no notice there was anything wrong with them. We got good title. And essentially we're being asked somehow to be responsible for wrongdoing engaged in by somebody else. There's no law to support it. We think the district court correctly threw the case out and correctly determined that there's no reason to give them a fourth bite of the apple. They've had plenty of chances to try and get it right. At some point, you have to acknowledge they can't get it right because they don't have the case. Thank you. Thank you, counsel. We have some rebuttal time remaining for Mr. Cronella. Just briefly, Your Honors, in going to this point about that the Court's been concerned with, I'd like to point to the allegations in paragraph 10C of the complaint at Record 209. When preparing to close a loan, general mortgage would transmit to impact the specifics of the loan, including the name of the investor that had agreed to purchase a loan in the secondary market. The Court was correct when it noted that one of the conditions was an understanding at the time that impact funded that there was a buyer, a secondary buyer on the market, and that, you know, the Court is correct in its understanding that there can't be the fraud. Just the front end of the fraud alone doesn't make the scheme work for GMAC general mortgage. What was required to do to make it work was to have the sale on the second end. That's substantial assistance of the aiders and abettors in this case to doing it. The other thing I want to note quickly was that we focused a lot on the fraud allegations and 9B, but that the conversion claims, aiding and abetting conversion, the negligence claims, don't require the specificity of Rule 9B and that the notice pleading standards, while we believe the allegations here satisfy even the 9B standard, that the notice pleading standards of 8A are satisfied as to the aiding and abetting conversion, conspiracy to convert, negligence, causes of action. If the Court has any questions. It does not appear that we do. Thank you, Your Honor. Thank you, counsel. The case just argued is submitted, and we appreciate very much the helpful arguments of both counsel. I hope you don't have too much snow to go home to, Mr. Smith. And we will move next to the final case on our morning docket, which is Sustene, Inc. v. SourceNet, next court.
judges: Hall, Graber, Berzon